Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Michael Vanunu, Esq.
Jaana Singh, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company,*
*GEICO Indemnity Company, GEICO General Insurance Company*
*and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and
GEICO CASUALTY COMPANY,

                       Plaintiffs,

        -against-

DROZ MEDICAL SUPPLY INC., DANIEL M.
DROZDOV, GB MEDICAL SUPPLY INC.,
GENNADIY BORTNIKOV, and JOHN DOE
DEFENDANTS "1" – "10",

                       Defendants.
-----------------------------------------------------------------X

Docket No.:_____ (      )

**Plaintiff Demands a Trial by Jury**

## <u>COMPLAINT</u>

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against Droz Medical Supply Inc. ("Droz Supply"), Daniel

M. Drozdov ("Drozdov"), GB Medical Supply Inc. ("GB Supply"), Gennadiy Bortnikov

("Bortnikov"), and John Doe Defendants "1" – "10" (the "John Doe Defendants"), hereby allege

as follows:

## INTRODUCTION

1.      GEICO brings this action to recover more than $835,000.00 that Defendants have wrongfully obtained from GEICO by submitting and causing hundreds of fraudulent No-Fault insurance charges to be submitted relating to medically unnecessary, illusory, and otherwise non-reimbursable durable medical equipment ("DME") and orthotic devices ("OD") (e.g. cervical collars, lumbar-sacral supports, orthopedic car seats, orthopedic pillows, massagers, electronic heat pads, egg crate mattresses, etc.) comprised of, but not limited to, medically unnecessary Powered Pressure-Reducing Air Mattresses ("Air Mattresses"), Osteogenesis Bone Stimulators ("Osteo Stim Devices"), Pneumatic Compression Devices ("PCDs"), (collectively, the "Fraudulent Equipment") through Droz Supply and GB Medical Supply Inc. (collectively, the "DME Providers"). The Fraudulent Equipment is alleged have been provided to individuals who claimed to have been involved in automobile accidents in New York and eligible for coverage under No-Fault insurance policies issued by GEICO ("Insureds").

2.      The DME Providers are New York corporations that purport to be separate and independent companies respectively owned by Drozdov and Bortnikov (collectively, the "Paper Owner Defendants" and together with the DME Providers, the "Defendants"). However, the Paper Owner Defendants, in conjunction with others not presently identifiable to GEICO, devised and participated in a unified fraudulent scheme that involved colluding with the operators and managers (the "Clinic Controllers") of various No-Fault medical clinics (the "Clinics") and obtaining prescriptions through the payment of kickbacks and other financial incentives for medically unnecessary DME/OD purportedly issued by healthcare providers (the "Referring Providers") who were working out of Clincs in the New York metropolitan area, and using these prescriptions for medically unnecessary DME/OD to submit billing to GEICO and the New York automobile industry containing numerous false and fraudulent misrepresentations concerning the

2

Fraudulent Equipment allegedly provided to Insureds.

3.     Once the prescriptions were secured, Defendants then collectively billed GEICO alone more than $2.5 million, with the Defendants making virtually identical fraudulent misrepresentations to GEICO concerning the types of Fraudulent Equipment allegedly provided to Insureds and the maximum reimbursement rates they were entitled to receive. As part of their fraudulent scheme to wrongfully extract money from GEICO without detection, Defendants shifted the billing being submitted to GEICO from Droz Supply to GB Supply.

4.     Through this action, GEICO seeks to recover more than $835,000.00 that has been wrongfully obtained by the Defendants since 2023 and, further, seeks a declaration that it is not legally obligated to pay reimbursement of more than $1.2 million in pending No-Fault insurance claims that have been submitted by or on behalf of the DME Providers since inception because:

(i)     Defendants billed GEICO for Fraudulent Equipment pursuant to a unified fraudulent scheme that was designed and implemented to exploit Insureds for financial gain so as to benefit the Defendants and others not presently known (i.e. the John Doe Defendants), without regard for genuine patient care and which included dispensing Fraudulent Equipment that was not medically necessary and which was prescribed pursuant to predetermined fraudulent protocols, including prescriptions issued and secured through collusive arrangements;

(ii)    The Defendants billed GEICO for Fraudulent Equipment that was provided – to the extent actually provided – as a result of decisions made by laypersons, not based upon prescriptions issued by the Referring Providers who are licensed to issue such prescriptions;

(iii)   Defendants billed GEICO for Fraudulent Equipment when they were not eligible to collect No-Fault Benefits because they failed to comply with local licensing requirements; and

(iv)    To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted to GEICO by Defendants fraudulently mispresented the type and nature of the Fraudulent Equipment purportedly provided to Insureds as the Healthcare Common Procedure Coding System ("HCPCS") Codes identified in the bills did not accurately represent what was provided to Insureds and grossly inflated the permissible reimbursement rate that Defendants could have received for the Fraudulent

Equipment.

5.      The Defendants fall into the following categories:

(i)      Defendants Droz Supply and GB Supply are both New York corporations that have been used as the billing arm of the fraudulent scheme – they purport to provide Fraudulent Equipment to persons who were allegedly injured in motor vehicle accidents, and bill New York automobile insurance companies, including GEICO;

(ii)      Defendant Drozdov is one of the primary drivers of the fraudulent scheme - he is listed on paper as the owner, operator, and controller of Droz Supply when, as discussed below, Drozdov works for one of the John Doe Defendants who secretly operated, managed, controlled and financially benefited from the DME Providers, and used Droz Supply to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims;

(iii)     Defendant Bortnikov is also one of the primary drivers of the fraudulent scheme  - he is listed on paper as the owner, operator, and controller of GB Supply, when, as discussed below, Bortnikov works for one of the John Doe Defendants who secretly operated, managed, controlled and financially benefited from the DME Providers, and used GB Supply to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims; and

(iv)     The John Doe Defendants are the other individuals involved in the fraudulent scheme – while they are not presently identifiable, they include the individual(s) secretly controlling and profiting from the DME Providers as part of a coordinated fraudulent scheme and the Clinic Controllers who are associated with the Clinics, and who have colluded with Defendants to further drive and financially benefit from the fraudulent scheme committed against GEICO and other New York automobile insurers through their associations with the Referring Providers and control of the Clinics.

6.      As discussed below, Defendants have always known that the claims for Fraudulent

Equipment submitted to GEICO were fraudulent because:

(i)      The billing submitted to GEICO and other New York automobile insurers was pursuant to a unified fraudulent scheme that was designed and implemented to exploit Insureds for financial gain so as to benefit the Defendants and others not presently known (i.e. the John Doe Defendants), without regard for genuine patient care, and which included dispensing Fraudulent Equipment that was not medically necessary and prescribed

pursuant to predetermined fraudulent protocols, including prescriptions secured through collusive arrangements;

(ii)    The Fraudulent Equipment was provided – to the extent provided – as a result of decisions made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions;

(iii)    The bills for Fraudulent Equipment submitted by Defendants to GEICO fraudulently misrepresented that Defendants complied with all local licensing requirements when Defendants were never lawfully licensed to provide Fraudulent Equipment to Insureds located within the City of New York, as they failed to obtain all necessary licenses to operate lawfully by the City of New York's Department of Consumer and Worker Protection; and

(iv)    To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted by Defendants to GEICO – and other New York automobile insurers – fraudulently and intentionally mispresented the type and nature of the Fraudulent Equipment purportedly provided to the Insureds as the HCPCS Codes identified in the bills did not accurately represent what was actually provided to Insureds and fraudulently and grossly inflated the permissible reimbursement rate that Defendants could have received for the Fraudulent Equipment.

7.    As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Equipment billed to GEICO through the DME Providers.

8.    The charts attached hereto as Exhibits "1" and "2" set forth a representative sample of the fraudulent claims that have been identified to date that were submitted, or caused to be submitted, to GEICO pursuant to Defendants' fraudulent scheme through Droz Supply and GB Supply.

9.    Defendants' fraudulent scheme against GEICO and the New York automobile insurance industry has been ongoing since at least December 2023 and has continued uninterrupted since that time as the Defendants continue to attempt collection on pending charges for the Fraudulent Equipment.  As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $835,000.00.

## THE PARTIES

### I.    Plaintiffs

10.    Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are all Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

### II.    Defendants

11.    John Doe Defendant "1" (hereinafter, the "Secret Owner") is presently not identifiable but is secretly controlling and profiting from the DME Providers, and who actively conspired with the Defendants and others who are not presently identifiable at various Clinics, to obtain prescriptions for medically unnecessary Fraudulent Equipment purportedly issued by the Referring Providers which were used by the Defendants as the basis to submit bills to GEICO and other New York automobile insurers seeking payment for the Fraudulent Equipment.

12.    Defendant Droz Supply is a New York corporation with its principal place of business at 1733 Sheepshead Bay Road #47, Brooklyn, NY 11235. Droz Supply was incorporated on May 23, 2023 and is owned on paper and purportedly operated and controlled by Drozdov. In actuality, the Secret Owner operated, managed, controlled and financially benefited from Droz Supply and, with the aid of Drozdov, used Droz Supply as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

13.    Defendant Drozdov resides in and is a citizen of New York and is listed as the "paper" owner of Droz Supply.  Drozdov is not and has never been a licensed healthcare provider. Drozdov, at all relevant times, has been one the primary drivers of the fraudulent scheme, as he participated in a scheme with the Secret Owner purporting to own, operate, and control Droz

Supply, associated with others not presently identifiable to obtain the illegitimate and medically unnecessary prescriptions from the Referring Providers, and used those prescriptions to submit bills to GEICO and other New York automobile insurance companies for the Fraudulent Equipment.

14.    Defendant GB Supply is a New York corporation with its principal place of business at 2515 E 63rd Street Brooklyn New York 11234. GB Supply was incorporated on October 18, 2024, and is owned on paper and purportedly operated and controlled by Bortnikov. In actuality, the Secret Owner operated, managed, controlled and financially benefited from GB Supply and, with the aid of Bortnikov, used GB Supply as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

15.    Defendant Bortnikov resides in and is a citizen of New York and is listed as the "paper" owner of GB Supply.  Bortnikov is not and has never been a licensed healthcare provider. Bortnikov, at all relevant times, has been one the primary drivers of the fraudulent scheme, as he participated in a scheme with the Secret Owner purporting to own, operate, and control GB Supply, associated with others not presently identifiable to obtain the illegitimate and medically unnecessary prescriptions from the Referring Providers, and used those prescriptions to submit bills to GEICO and other New York automobile insurance companies for the Fraudulent Equipment

16.    The John Doe Defendants are not presently identifiable and include the Clinic Controllers associated with the Clinics, who are not licensed healthcare professionals but who unlawfully own and control the Clinics and the relationships with the Referring Providers, and who have conspired with the Defendants and Secret Owner to further the fraudulent scheme committed against GEICO and other New York automobile insurers for their own economic

benefit.

## JURISDICTION AND VENUE

17.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

18.    Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

19.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred, and where one or more of Defendants reside.

## ALLEGATIONS COMMON TO ALL CLAIMS

20.    GEICO underwrites automobile insurance in the State of New York.

**I.    An Overview of the Pertinent Laws**

**A.    Pertinent Laws Governing No-Fault Insurance Reimbursement**

21.    New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

22.    Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

23.     In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME. See N.Y. Ins. Law § 5102(a).

24.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

25.     Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

26.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

27.     In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

28.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

29.     Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service

provider to GEICO, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.    Pertinent Regulations Relating to No-Fault Benefits, DME and OD**

30.    Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME or OD that was provided pursuant to a lawful prescription from a licensed healthcare provider. See N.Y. Ins. Law § 5102(a). By extension, DME or OD that was provided without a prescription, pursuant to an unlawful prescription, and/or by reason of a decision of a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

31.    Under New York State's Public Health Law, "a practitioner may not make a referral to a health care provider for the furnishing of any health or health related items or services where such practitioner . . . has any of the following financial relationships without disclosing to the patient such financial relationship: . . . (b) a compensation arrangement". See N.Y. P.H.L. § 238-d(1).  A practitioner is defined to include "a licensed or registered physician, dentist, podiatrist, chiropractor, nurse, midwife, physician assistant or specialist assistant, physical therapist, or optometrist". See N.Y. P.H.L. § 238(11).

32.    A health care provider is defined to include "a purveyor of health or health related supplies, appliances or equipment", which are DME suppliers such as Droz Supply and GB Supply. See N.Y. P.H.L. § 238(6).  A compensation arrangement, as referenced in N.Y. P.H.L. § 238-d, includes any remuneration, whether directly, indirectly, overly, covertly, in cash, or in kind that is between a practitioner and a health care provider. See N.Y. P.H.L. § 238-a(5)(a).

33.     Title 20 of the City of New York Administrative Code imposes licensing requirements on healthcare providers located within the City of New York which engage in a business which substantially involves the selling, renting, repairing, or adjusting of products for the disabled, which includes DME.

34.     The City of New York's Administrative Code requires DME suppliers to obtain a Dealer in Products for the Disabled License ("Dealer in Products License") issued by the City of New York's Department of Consumer and Worker Protection ("DCWP") in order to lawfully provide DME to the disabled, which is defined as "a person who has a physical or medical impairment resulting from anatomical or physiological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques". See 6 RCNY § 2-271; NYC Admin. Code §20-425.

35.     It is unlawful for any DME supplier to engage in the selling, renting, fitting, or adjusting of products for the disabled within the City of New York without a Dealer in Products License.  See NYC Admin. Code §20-426.

36.     A Dealer in Products License is obtained by filing a license application with the DCWP. The application requires that the applicant identify, among other pertinent information, the commercial address of where the DME supplier is physically operating from.

37.     The license application for a Dealer in Products License also requires the applicant to affirm that they are authorized to complete and submit the application on behalf of the corporate entity seeking a license and that the information contained in the application is true, correct, and complete. The affirmation to the application requires a signature that is made under penalty for false statements under Sections 175.30, 175.35, and 210.45 of New York's Penal Law.

38.     DME generally consists of items that can withstand repeated use, and primarily

consists of items used for medical purposes by individuals in their homes. For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), electrical moist heating pads (known as thermophores), cervical traction units, and whirlpool baths.

39.    OD consists of instruments that are applied to the human body to align, support, or correct deformities, or to improve the movement of the spine, joints, or limbs.  These devices come in direct contact with the outside of the body, and include such items as cervical collars (i.e., "whiplash" collars), lumbar supports, knee supports, ankle supports, wrist braces, and the like.

40.    To ensure that Insureds' $50,000.00 in maximum No-Fault Benefits are not artificially depleted by inflated DME charges, the maximum charges that may be submitted by healthcare providers for DME are set forth in the New York State Workers' Compensation Board instituted the New York State Workers' Compensation Durable Medical Equipment Fee Schedule ("DME Fee Schedule"), which is reflected in 12 N.Y.C.R.R. 442.2.

41.    In a June 16, 2004 Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment", the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

42.    According to the DME Fee Schedule, certain pieces of DME have an established fee payable ("Fee Schedule item"), which is the maximum permissible charge for a specific item of DME based on its Healthcare Common Procedure Coding System ("HCPCS") Code, which

provides specific characteristics and requirements that an item of DME must meet in order to qualify for reimbursement under that specific HCPCS Code.

43.    For Fee-Schedule items, Palmetto GBA, LLC ("Palmetto"), a Medicare Administrative Contractor ("MAC") for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning HCPCS Codes that should be used by DME companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME must meet in order to qualify for reimbursement under a specific HCPCS Code.

44.    The DME Fee Schedule uses HCPCS Codes promulgated by Palmetto to identify the maximum charge for selling specific DME and for renting Fee Schedule items on a weekly basis.

45.    Where a specific piece of DME does not have a maximum reimbursement rate in the DME Fee Schedule ("Non-Fee Schedule item") then the fee payable by an insurer such as GEICO to the provider shall be the lesser of: (i) 150% of the acquisition cost to the provider; or (ii) the usual and customary price charged to the general public.

46.    For Non-Fee Schedule items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement." See New York State Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004 Opinion Letter.

47.    Accordingly, when a healthcare provider submits a bill to collect charges from an

insurer for DME using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

(i)    The provider is in compliance with all significant statutory and regulatory requirements;

(ii)    The provider received a legitimate prescription that was issued in accordance with the requirements of applicable laws and is for reasonable and medically necessary DME and/or OD from a healthcare practitioner that is licensed to issue such prescriptions;

(iii)    The DME or OD identified in the bill was actually provided to the patient based upon a legitimate prescription identifying medically necessary item(s);

(iv)    The HCPCS Code identified in the bill actually represents the DME or OD that was provided to the patient; and

(v)    The fee sought for DME or OD provided to an Insured was not in excess of the price contained in the applicable DME Fee Schedule, or the standard used for a Non-Fee Schedule item.

## II.    Defendants' Fraudulent Scheme

### A.    The DME Providers' Common Secret Ownership

48.    The John Doe Defendants actively conspired with the Paper Owner Defendants to implement a complex fraudulent scheme in which the DME Providers were used consecutively and in conjunction with each other to bill GEICO and other New York automobile insurers for millions of dollars in No-Fault Benefits to which they were never entitled to receive.

49.    While the DME Providers were formed and listed as being independently owned by one of the Paper Owner Defendants, both of the DME Providers were in actuality, controlled by the Secret Owner, who also profited from the fraudulent scheme committed against GEICO and other New York automobile-insurers.

50.    The Secret Owner was able to secretly control and profit from the DME Providers by using each of the Paper Owner Defendants as "straw" owners who would place their name on

documents that needed to be filed with the State of New York and City of New York to lawfully operate the DME Providers.

51.     Illustrative of the fact that the Secret Owner actually owned, controlled, and profited from the DME Providers, and used the Paper Owner Defendants to further the fraudulent scheme herein, there is significant overlap in the operations of the various DME Providers that could only exist through the Secret Owner's involvement.

52.     For example, the DME Providers both predominantly billed GEICO for the same four (4) items of DME, namely two different types of Osteo Stim Devices, Air Mattresses, and PCDs.

53.     The DME Providers both used virtually identical delivery receipts, with the sole exception being the Provider information. For example:



54.     Similarly, the referring clinics employed prescription templates with virtually

identical design and layout, despite coming from different providers at different locations. For example:

| Script to GB Supply | |
| --- | --- |
| Script to Droz Supply | |

55.    Additionally, as described in more detail below, the common ownership is illustrated by the fact that the Defendants would split the billing for Fraudulent Equipment between Droz Supply and GB Supply.

56.    Additionally, the DME Providers used the same collection law firm – Sanders Grossman Aronova, PLLC– which continues to work in furtherance of the fraudulent scheme and to actively seek collection on the fraudulent billing on behalf of each of the Defendants through the mass filing of No-Fault collection lawsuits and/or arbitrations against GEICO.

57.    The Secret Owner, together with the Paper Owner Defendants, operated the DME Providers in the following sequential fashion in an effort to limit the amount of billing submitted from any one of the DME Providers and mask the common fraudulent scheme:

> (i)    Droz Supply billed GEICO for dates of service between July 11, 2023 and November 14, 2024; and
>
> (ii)    GB Supply billed GEICO for dates of service beginning October 21, 2024 and continuing through the present.

58.    Further, as part of Defendants' efforts to mask the Secret Owner's operation and control of the DME Providers, GEICO attempted to verify the claims submitted by Defendants by way of demanding examinations under oath, but the Paper Owner Defendants intentionally refused to appear and to provide testimony and/or documents because they would have been unable to answer key questions about the DME Providers' operations and their testimony would reveal the fraudulent scheme and the secret ownership behind that scheme.

**B.    Overview of the Common Fraudulent Scheme**

59.    The Secret Owner, together with the Paper Owner Defendants, conceived and implemented a complex fraudulent scheme in which they used the DME Providers as vehicles to bill GEICO and other New York automobile insurers for millions of dollars in No-Fault Benefits

which Defendants were never entitled to receive.

60.     To maximize the amount of No-Fault benefits Defendants could receive, the Secret Owner, along with the Paper Owner Defendants, used the DME Providers in sequential fashion to allocate and divide the billing that they were submitting to No-Fault insurance carriers, including GEICO.

61.     In keeping with the fact that the Defendants split their billing in order maximize the amount of No-Fault benefits they could collect, the DME Providers operated in sequential order, with some overlap, to allow more than one entity to bill No-Fault insurance carriers, including GEICO, at a single time.

62.     Through the complex scheme, the Secret Owner and the Paper Owner Defendants used the DME Providers to bill and collect No-Fault Benefits from GEICO and other automobile insurers that they were never entitled to collect.  Specifically:

> (i)     Between July 11, 2023 and November 14, 2024, Droz Supply submitted more than $1.1 million in fraudulent claims to GEICO, has wrongfully obtained more than $530,000.00, and there is more than $400,000.00 in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment of from GEICO; and
>
> (ii)    Between October 21, 2024 and the present, GB Supply submitted more than $1.2 million in fraudulent claims to GEICO, has wrongfully obtained more than $300,000.00, and there is more than $850,000.00 in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment of from GEICO.

63.     Defendants were able to perpetrate the fraudulent scheme against GEICO described below by obtaining illegitimate prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers because of unlawful agreements with the Clinic Controllers and other John Doe Defendants who are associated with the Clinics.

64.     Based on these improper agreements, the Defendants received prescriptions for

specific types of Fraudulent Equipment despite there not existing the medical conditions necessary to support such prescriptions, such for as Osteo Stim Devices meant to promote bone growth in bone fractures despite Insureds not suffering any broken bones, PCDs to treat a specific condition known as "arterial insufficiency" despite Insureds not being diagnosed with such a condition, and Air Mattresses meant to heal bed sores in bed-bound individuals despite Insureds not being confined to a bed.

65.    Notably, none of Defendants marketed or advertised the DME Providers to the general public, and they lacked any genuine retail or office location, and operated without any legitimate efforts to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

66.    Similarly, the Paper Owner Defendants did virtually nothing that would be expected of the owner of a legitimate DME supply company to develop its reputation in the medical community or to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

67.    Instead, the Defendants entered into collusive agreements with the Clinic Controllers and other John Doe Defendants associated with both the Clincs and the Referring Providers whereby kickbacks and other financial incentives were paid so that Defendants would receive large volumes of prescriptions from the Referring Providers in relation to Insureds who were being treated at the Clinics.

68.    The prescriptions obtained by the Defendants for Fraudulent Equipment were never given to the Insureds to fill, but as part of the fraudulent scheme, they were routed directly to the Defendants at the direction of the Clinic Controllers to ensure that the Insureds did not fill the prescriptions with legitimate DME and OD retailers, who would likely question the legitimacy of

the prescription, the volume of prescriptions, or the need for the DME/OD in the first instance.

69.     Unlike legitimate medical supply companies that dispense a variety of DME devices and healthcare related products, the Defendants intentionally targeted specific Fraudulent Equipment as part of their scheme so they could submit inflated claims for reimbursement to GEICO.

70.     In fact, the fraud scheme between the two DME Providers developed such that Droz Supply at first billed for a variety of DME and OD which also included Osteo Stim Devices, Air Mattresses, and PCDs, but the operation then shifted with GB Supply only providing the most expensive and profitable devices: Osteo Stim Devices, Air Mattresses, and PCDs.

71.     This scheme enabled Defendants to maximize the amount of No-Fault Benefits they could obtain from GEICO and other New York automobile insurers through the submission of claims for Fraudulent Equipment.

72.     The prescriptions obtained by the Defendants for Fraudulent Equipment included prescriptions which the Defendants used to misrepresent the nature and quality of the items that they actually dispensed, so as to claim entitlement to a higher fee payable by automobile insurers like GEICO.

73.     The Defendants submitted bills to GEICO seeking reimbursement for specific types of Fraudulent Equipment using specific HCPCS Codes.

74.     By submitting bills to GEICO seeking No-Fault Benefits for Fraudulent Equipment based upon specific HCPCS Codes, the Defendants indicated that they provided Insureds with the particular items associated with each unique HCPCS Code, and that such specific item was medically necessary as determined by a healthcare provider licensed to prescribe DME and/or OD.

75. However, to the extent that any Fraudulent Equipment was actually provided to Insureds, the Fraudulent Equipment did not match the HCPCS Codes identified in the bills submitted by the Defendants.

76. Instead, to the extent that any Fraudulent Equipment was provided to the Insureds, the Defendants provided Insureds with inexpensive and poor-quality Fraudulent Equipment, which did not contain all the features required by the HCPCS Codes identified in the bills submitted by the Defendants.

77. The Fraudulent Equipment actually provided to Insureds – again to the extent that any Fraudulent Equipment was actually provided – were inexpensive and poor-quality items that only qualified under HCPCS Codes with significantly lower maximum reimbursement rates than the HCPCS Codes actually identified in the bills submitted by the Defendants to GEICO.

78. After obtaining prescriptions for Fraudulent Equipment as a result of their collusive relationships with the Clinic Controllers and other John Doe Defendants, the Defendants in turn then billed GEICO for: (i) Fraudulent Equipment that was not reasonable nor medically necessary; (ii) Fraudulent Equipment that was not based on valid prescriptions from licensed healthcare providers; (iii) Fraudulent Equipment that did not represent the HCPCS codes contained in the bills to GEICO; and (iv) Fraudulent Equipment with inflated charges that far exceeded the value of the actual products they provided to GEICO's Insureds.

**C. Defendants Failure to Comply with Local Licensing Provisions**

79. As stated above, for a DME supplier to provide DME to automobile accident victims within the City of New York, the DME supplier must obtain a Dealer in Products License by the DCWP.

80. For Defendants to lawfully provide DME to the Insureds identified in Exhibits "1"

and "2", the DME Providers were required to obtain a Dealer in Products License because an overwhelming majority of the Insureds identified in Exhibits "1" and "2" were located within the City of New York.

81.     However, neither Droz Supply nor GB Supply ever obtained a Dealer in Products license issued by the DCWP.

82.     As a result, neither Droz Supply nor GB Supply was ever eligible to collect No-Fault Benefits because they never obtained a Dealer in Products license issued by the DCWP.

83.     In each of the claims identified in Exhibits "1" and "2" Defendants fraudulently misrepresented that they were properly licensed with all local statutory and regulatory requirements and were lawfully permitted to provide DME to Insureds when Defendants were never eligible to collect No-Fault Benefits in the first instance because both Droz Supply and GB Supply failed to apply for or obtain a Dealer in Products license.

**D.     The Fraudulent Scheme – Predetermined Fraudulent Protocols Associated with the Prescriptions**

84.     Defendants were able to obtain prescriptions that could be used as a basis to submit bills to GEICO through predetermined fraudulent protocols that were established between and among the Defendants, the Clinic Controllers and other John Defendants, and the Referring Providers.

85.     Through these predetermined fraudulent protocols, the Defendants obtained prescriptions for Fraudulent Equipment that were not medically necessary and were created solely to financially enrich the Defendants and John Doe Defendants, not to genuinely treat and/or benefit the Insureds.

86.     As set forth below, the extent of the Insureds' motor vehicle accidents, physical conditions, and conservative treatment plans demonstrate a pattern of prescribing and dispensing

Fraudulent Equipment to the Insureds that were not medically necessary to treat the Insureds post-accident condition.

87.    Virtually all of the Insureds who were prescribed the Fraudulent Equipment identified in Exhibits "1" and "2" were involved in relatively minor and low-impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

88.    Concomitantly, almost none of the Insureds identified in Exhibits "1" and "2', whom the Referring Providers purported to treat, suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

89.    In keeping with the fact that the Insureds identified in Exhibits "1" and "2" suffered only minor injuries – to the extent they had any injuries at all – as a result of the relatively minor accidents, many of the Insureds did not seek treatment at any hospital as a result of their accidents.

90.    To the extent the Insureds in the claims identified in Exhibits "1" and "2" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way with nothing more serious than a minor soft tissue injury, such as a sprain or strain.

91.    However, despite virtually all of the Insureds being involved in relatively minor and low-impact accidents and only suffering from sprains and strains – to the extent that the Insureds were actually injured – virtually all of the Insureds were subject to extremely similar and medically unnecessary treatment protocols, including nearly identical prescriptions for Fraudulent Equipment.

92.    The prescriptions for Fraudulent Equipment that were purportedly issued to the Insureds identified in Exhibits "1" and "2" were issued pursuant to predetermined fraudulent

protocols set forth at each Clinic, and not because the Fraudulent Equipment was medically necessary for each Insured based upon his or her individual symptoms or presentations.

93.    For example, the predetermined fraudulent protocols at each Clinic (i) included issuing predetermined sets of Fraudulent Equipment that applied to virtually all Insureds, regardless of each patient's individual symptoms or presentation, and (ii) were not based upon what was medically necessary for each patient.  Instead, they were created based upon how the John Doe Defendants, and others including the Defendants, could profit from exploiting prescriptions purportedly issued by the Referring Providers.

94.    In keeping with the fact that the prescriptions were based upon predetermined fraudulent protocols, not what was medically necessary for the Insureds, virtually all of the Insureds were prescribed Osteo Stim Devices after their low-speed and low-impact motor vehicle accidents, when such devices are – in a legitimate clinical setting – only provided to patients after appropriate consideration for a specific, documented, and corelated condition relating to a long-bone fracture that has not properly healed after a period of time.

95.    In other words, no legitimate physician, chiropractor, other licensed healthcare provider, or professional entity would permit prescriptions for Fraudulent Equipment to be issued based upon the fraudulent protocols at the various Clinics that were the prescription sources for the Defendants.

96.    In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment from a healthcare provider, the patient's subjective complaints are evaluated, and the treating provider will direct a specific course of treatment based upon the patients' individual symptoms or presentation.

97.    Furthermore, in a legitimate setting, during a patient's treatment, a healthcare provider may – but generally does not – prescribe DME and/or OD.

98.    In determining whether to prescribe DME and/or OD to a patient – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the specific DME and/or OD could have any negative effects based upon the patient's physical condition and medical history; (ii) whether the DME and/or OD is likely to help improve the patient's complained of condition; and (iii) whether the patient is likely to use the DME and/or OD. In all circumstances, any prescribed DME and/or OD would always directly relate to each patient's individual symptoms or presentation.

99.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in an automobile accident.

100.    For example, an individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

101.    If a healthcare provider determines that DME and/or OD is medically necessary after considering a patient's individual circumstances and situations, in a legitimate setting, the healthcare provider would document in a contemporaneous medical record, such as an evaluation report, what specific DME and/or OD was prescribed, why it was medically necessary, or how it would help the Insureds.

102.    Further, in a legitimate setting, when a patient returns for an examination after being prescribed DME and/or OD, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME and/or OD aided the patient's subjective complaints. Such

information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME and/or OD or newly issued DME and/or OD.

103.    It is improbable – to the point of an impossibility – that virtually all of the Insureds identified in Exhibits "1" and "2" who were treated at a specific Clinic would receive virtually identical prescriptions for numerous items of Fraudulent Equipment, despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

104.    It is even more improbable – to the point of impossibility – that virtually all of the Insureds identified in Exhibits "1" and "2" who were treated by different Referring Providers at a specific Clinic would receive virtually identical prescriptions for numerous items of Fraudulent Equipment despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

105.    Here, and in keeping with the fact that the prescriptions provided to the Defendants were for medically unnecessary Fraudulent Equipment obtained as part of an insurance scheme in which there were predetermined fraudulent protocols, virtually all of the Insureds identified in Exhibits "1" and "2" that were treated at a specific Clinic were issued virtually identical prescriptions for a predetermined set of Fraudulent Equipment, despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

106.    To the extent that there was a contemporaneously dated evaluation report, the evaluation report virtually always failed to explain – and oftentimes failed to identify – the Fraudulent Equipment identified on the prescriptions provided to the Defendants and used by the Defendants to bill GEICO for the charges identified in Exhibits "1" and "2".

107.    For the reasons set forth above, and below, in each of the claims identified in Exhibits "1" and "2", the Defendants falsely represented that the Fraudulent Equipment was

provided pursuant to legitimate prescriptions from healthcare providers for medically necessary DME or OD, and were, therefore, entitled to collect No-Fault Benefits in the first instance, when, in fact, the prescriptions were for medically unnecessary Fraudulent Equipment issued as part of the Defendants' insurance fraud scheme.

### 1. Collusive Arrangements to Obtain Illegitimate and Medically Unnecessary Prescriptions

108.    To gain access to Insureds so that they could implement and execute their fraudulent scheme and maximize the amount of No-Fault Benefits that could be obtained from GEICO and other New York automobile insurers, the Defendants entered into collusive agreements with the Clinic Controllers and other John Doe Defendants in order to procure and direct prescriptions to the DME Providers that were illegitimate and for medically unnecessary Fraudulent Equipment.

109.    Since the inception of the DME Providers, the Defendants engaged in various collusive arrangements with the Clinic Controllers and other John Doe Defendants pursuant to which Defendants paid kickbacks or other financial incentives in exchange for being provided prescriptions to fill from the Referring Providers for the Fraudulent Equipment that could then be used by the DME Providers to support their charges to GEICO and other New York automobile insurers.  The improper financial arrangements were key to the fraudulent scheme in that they allowed the Defendants to submit hundreds of charges for Fraudulent Equipment to GEICO and other New York automobile insurers.  However, the collusive nature of the arrangement goes beyond the simple of payment of money or other financial incentives, but includes (i) payment to fictitious businesses associated with the John Doe Defendants, (ii) the ability to secure the prescriptions without ever meeting the Referring Providers, (iii) obtaining the prescriptions directly from the staff at the Clinics, without any communication or involvement by the Insureds,

and (iv) providing the Fraudulent Equipment to the Clinic and its staff, with any interaction with the Insureds, and without any interaction with the Defendants.

110.    The collusive arrangements allowed the scheme to remain undetected by the Insureds and allowed the Defendants to access large volumes of prescriptions that in turn afforded them the opportunity to submit charges for thousands of dollars in Fraudulent Equipment for each Insured to GEICO and other automobile insurers.   But for the collusive arrangements, neither the John Doe Defendants nor the Referring Providers would have had any reason to direct a substantial volume of these medically unnecessary prescriptions for Fraudulent Equipment to Droz Supply and GB Supply to purportedly fill.

111.    Upon information and belief, the Referring Providers were compensated by the Clinic Controllers or other John Doe Defendants, whether financially or through some other economic quid pro quo (e.g. the ability to treat the Insureds and independently bill GEICO), for the Referring Providers' willingness to permit prescriptions to be issued in their names and to be given to DME suppliers, including Droz Supply and GB Supply, rather than given to the Insureds or to a bona-fide DME/OD retailer, who would likely question its legitimacy.

112.    The collusive relationship between the Defendants and John Doe Defendants in relation to the prescriptions are the very kind of arrangement that is prohibited by N.Y. Public Health Law § 238-d, without a specific disclosure to the patient of the financial relationship between the Referring Provider, Droz Supply, and GB Supply.   In actuality, no such disclosure required by Public Health Law § 238-d was ever made to the Insureds identified in Exhibits "1" and "2".   Rather, because of the nefarious nature of the relationship between the Defendants and the John Doe Defendants, the arrangements between and among the Defendants, John Doe Defendants, and Referring Providers was concealed from the Insureds.

113.    As a result of these collusive relationships, the Defendants (rather than the Insured or a bona-fide DME /OD retailer) were given the illegitimate prescriptions, which (i) were for medically unnecessary Fraudulent Equipment that was not based upon each Insured's individual need; (ii) contained a photocopied signature of the Referring Provider; (iii) were issued on a date the Referring Provider did not treat or otherwise examine the Insured; and/or (iv) were pre-signed/boilerplate with the patient names changed.

114.    Illustrative of the fact that the collusive relationships between the Defendants, Clinic Controllers, and other John Doe Defendants was designed to obtain illegitimate prescriptions associated with Insureds treating at the Clinics, the Defendants received prescriptions from the Clinics that contained photocopied signatures of the Referring Providers, such as the following representative examples:

Example 1: Dr. Jean Pierre Barakat Photocopied Prescriptions for "E0760: Ultrasound Therapy"

| **Example** | **Sample photocopied signatures** |
|---|---|
| Prescription to **GB Supply** for Insured KO | |
| Prescription to **GB Supply** for Insured AL | |

Example 2: Dr. Barakat Photocopied Prescriptions for "E0675: Pneumatic Compression Devices"

| Example | Sample photocopied signatures |
|---|---|
| Prescription to **GB Supply** for Insured AL | |
| Prescription to **Droz Supply** for Insured GI | |

Example 3: Dr. Barakat Photocopied Prescriptions for "E0747: Osteogenesis Stimulator"

| Example | Sample photocopied signatures |
|---|---|
| Prescription to **GB Supply** for Insured KO | |
| Prescription to **Droz Supply** for Insured LF | |

30

Example 4: Dr. Barakat Photocopied Prescription for "E0277: Powered Pressure-Reducing Air Mattress"

| **Example** | **Sample photocopied signatures** |
|---|---|
| Prescription to **Droz Supply** for Insured AL | |
| Prescription to **Droz Supply** for Insured ZA | |

Example 5: Dr. Nick Nicoloff Photocopied Prescriptions for "E0675: Pneumatic Compression Device" and "E0760: Osteogenesis Stimulator Ultrasound"

| **Example** | **Sample photocopied signatures** |
|---|---|
| Prescription to **Droz Supply** for Insured LT | |
| Prescription to **Droz Supply** for Insured MD | |

115.    The Defendants were able to obtain these illegitimate prescriptions for Fraudulent Equipment due to their collusive arrangements with the Clinic Controllers and other John Doe Defendants at each of the Clinics, which gave them access to the illegitimate prescriptions.

116.    In contrast to a bona fide DME/OD retailer, the Defendants were willing to obtain illegitimate prescriptions through collusive arrangements and submit the illegitimate prescriptions to support their charges to GEICO and other automobile insurers.

117.    These Clinics included but were not limited to: (i) 4014 Boston Road, Bronx, New York; (ii) 282 Avenue X Brooklyn New York; and (iii) 625 E Fordham Road, Bronx New York.

118.    Although ostensibly organized to provide a range of healthcare services to Insureds at a single location, many of the Clinics operate under the unlawful ownership and control of unlicensed laypersons, with a revolving door of healthcare providers providing treatment to the Insureds and other patients without any continuity of care.

119.    In fact, GEICO has received billing from an ever-changing number of fraudulent healthcare providers at a variety of different Clinics that were the sources of the prescriptions for Defendants, which start and stop operations without any purchase or sale of a "practice", without any legitimate transfer of patient care from one professional to another, and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's No-Fault insurance system.

120.    For example, one of the Clinics from which Defendants obtained prescriptions was a No-Fault Clinic located at 4014 Boston Road, Bronx, New York 10475, ("Boston Road Clinic") which is a Clinic with a "revolving door" of numerous healthcare providers. In fact, GEICO has received billing from at least 46 providers at this location.

121.    Defendants also obtained prescriptions from a No-Fault Clinic located at 282

Avenue X Brooklyn New York 11223, which is a Clinic with a "revolving door" of numerous healthcare providers. In fact, GEICO has received billing from at least 28 service providers at this location.

122. As another example, Defendants obtained prescriptions from a No-Fault Clinic located at 625 E Fordham Road, Bronx New York 10458, which is a Clinic with a "revolving door" of numerous healthcare providers. In fact, GEICO has received billing from over 50 different healthcare providers at this location.

123. Additionally, Defendants also obtained prescriptions from Jean-Pierre Barakat, M.D., who has been sued by GEICO on multiple prior occasions for his involvement in similar fraudulent schemes. See, GEICO v. Barakat et al., 1:22-cv-07532(NGG)(RML) (E.D.N.Y. 2022), GEICO v. Gelb et al., 1:23-cv-05250(ENV)(RML) (E.D.N.Y. 2023), GEICO v. Direct Rx Pharmacy Inc. et al., 1:19-cv-05876(DG)(LB) (E.D.N.Y 2019), Allstate Ins. Co. et al. v. New Century Pharmacy Inc. et al., 1:19-cv-05702(ENV)(VMS) (E.D.N.Y. 2019).

124. Unlicensed laypersons, rather than the healthcare professionals working in the Clinics, created and controlled the patient base at the Clinics, and directed fraudulent protocols used to maximize profits for the generation of revenue for their own benefit and the benefit of those with whom they are associated without regard to actual patient care.

### 2. Medically Unnecessary Prescriptions for Specifically Targeted Fraudulent Equipment

125. As part of the Defendants' fraudulent scheme with the Clinic Controllers and other John Doe Defendants, prescriptions for specifically targeted and expensive pieces of medically unnecessary Fraudulent Equipment were purportedly issued by Referring Providers at the Clinics and then routed to Defendants.

126. These pieces of Fraudulent Equipment included osteogenesis bone stimulators

(Osteo Stim Devices), pneumatic compression devices (PCDs), and powered pressure reducing air mattresses (Air Mattresses), which have specific prerequisites for their medical utility which were not present in the Insureds who were prescribed this Fraudulent Equipment.

### i.    Osteo Stim Devices

127.    As part of the fraudulent scheme, the Referring Providers purportedly prescribed, and the Defendants purportedly dispensed Osteo Stim Devices which the Defendants billed to GEICO under HCPCS Codes E0747 and E0760 resulting in charges of $3,300.00 and $2,700.00 respectively per Insured who purportedly received the device, even though at best, the Defendants dispensed cheap, portable stimulation devices, to the extent any device was dispensed at all.

128.    Osteogenesis stimulators are devices used to encourage bone growth and accelerate fracture healing.  Various commercial insurers have issued policy bulletins that make clear the use of an osteogenesis stimulator is only necessary to heal bone fractures under limited circumstances, while MACs for the Centers for Medicare & Medicaid Services ("CMS") have published guidance stating that electrical osteogenesis stimulators billed under HCPCS Codes E0747 or E0760 are covered only in limited circumstances.

129.    Specifically, CMS's published guidance states as follows:

> A non-spinal electrical osteogenesis stimulator (**E0747**) is covered only if any of the following criteria are met:
>
> 1.    Nonunion of a long bone fracture (see Appendices section) defined as radiographic evidence that fracture healing has ceased for three or more months prior to starting treatment with the osteogenesis stimulator, or
> 2.    Failed fusion of a joint other than in the spine where a minimum of nine months has elapsed since the last surgery, or
> 3.    Congenital pseudarthrosis.
>
> Nonunion of a long bone fracture must be documented by a minimum of two sets of radiographs obtained prior to starting treatment with the osteogenesis stimulator, separated by a minimum of 90 days, each including multiple views of the fracture site, and with a written interpretation by a treating practitioner stating

that there has been no clinically significant evidence of fracture healing between the two sets of radiographs.

A non-spinal electrical osteogenesis stimulator will be denied as not medically necessary if none of the criteria above are met…

An ultrasonic osteogenesis stimulator (**E0760**) is covered only if all of the following criteria are met:

1. Nonunion of a fracture documented by a minimum of two sets of radiographs obtained prior to starting treatment with the osteogenesis stimulator, separated by a minimum of 90 days. Each radiograph set must include multiple views of the fracture site accompanied by a written interpretation by a treating practitioner stating that there has been no clinically significant evidence of fracture healing between the two sets of radiographs; and
2. The fracture is not of the skull or vertebrae; and
3. The fracture is not tumor related.

See https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?LCDId=33796.

130.     Notwithstanding the limited, accepted uses for osteogenesis stimulators, the Referring Providers repeatedly prescribed and the Defendants billed for two different types of expensive osteogenesis stimulators under HCPCS Codes E0747 and E0760, seeking a total of $6,000.00 for the two devices, which were purportedly dispensed to Insureds who suffered no bone fractures – all solely to maximize profits without regard to genuine patient care.

131.     Virtually all of the charges for the Osteo Stim Devices submitted by the Defendants were pursuant to preprinted prescription forms. These prescription forms were distributed to the Referring Providers to sign, and in some cases their signature was then photocopied as part of the Defendants' scheme bill GEICO for medically unnecessary Fraudulent Equipment.

132.     The prescription forms contained generic language regarding the legitimate use of osteogenesis stimulators that was not individualized to fit each Insured's condition:

> Osteogenesis stimulators assist in healing fractures when healing has stalled. This procedure is one of complex processes which depend on factors such as the rate at which bone repairs, the level of tissue damage and degree of separation between bone ends, and the blood flow to the area.

133.    These template prescriptions refer to an osteogenesis stimulator's legitimate use in healing bone fractures, yet none of the Insureds identified in Exhibits "1" and "2" had a documented bone fracture that met the qualifications for legitimate application of an Osteo Stim Device as described above.

134.    For these reasons in each of the claims identified in Exhibits "1" and "2" the Defendants falsely represented that the Osteo Stim Devices billed to GEICO under HCPCS Codes E0747 and E0760 were medically necessary, and were, therefore, eligible to collect No-Fault Benefits, when, in fact, the prescriptions were for medically unnecessary osteogenesis stimulators issued by the Referring Providers pursuant to predetermined fraudulent protocols and provided to the Defendants pursuant to the Defendants' fraudulent scheme.

### ii.    Pneumatic Compression Devices

135.    As an additional part of their fraudulent scheme, the Referring Providers purportedly prescribed, and the Defendants purportedly dispensed and billed for PCDs under HCPCS Code E0675 resulting in charges of resulting in charges of $2,826.70 per Insured who purportedly received the device, even though at best, the Defendants dispensed cheap, portable devices, to the extent any device was dispensed at all.

136.    PCDs are devices which inflate and deflate removable cuffs placed on a person's limbs.  In legitimate practice, different types of PCDs are used to: (i) aid in the prevention of developing deep vein thrombosis ("DVT") in bed-bound or limited mobility patents; (ii) treat lymphedema, which is a condition causing swelling due to a buildup of lymph fluid in the body's tissues; or (iii) aid in the treatment of arterial insufficiency in individuals with peripheral artery disease, which is a circulatory condition where narrowed blood vessels reduce blood flow to the

limbs.

137. Virtually all of the charges for PCDs the Defendants submitted, or caused to be submitted, were pursuant to preprinted PCD prescription forms prescribing "E0675: Pneumatic Compression Device". These prescription forms were distributed to the Referring Providers to sign, and in some cases their signature was then photocopied as part of the Defendants' scheme bill GEICO for medically unnecessary Fraudulent Equipment.

138. HCPCS Code E0675 is defined as a "high pressure, rapid inflation/deflation cycle, for arterial insufficiency (unilateral and bilateral system)."

139. The contemporaneous medical records do not indicate that the Insureds identified in Exhibits "1" and "2" who received a prescription for a PCD from Referring Providers were diagnosed with arterial insufficiency or peripheral artery disease.

140. To create the false impression that the PCDs dispensed by the Defendants were medically necessary, the prescriptions issued by the Referring Providers contained the following generic preprinted language on each prescription issued to Insureds:

> Pneumatic Compression Device is used to deliver high pressure and rapid inflation/deflation cycles for treatment of arterial insufficiency.

141. For these reasons in each of the claims identified in Exhibits "1" and "2" the Defendants falsely represented that PCDs were medically necessary, and were, therefore, eligible to collect No-Fault Benefits, when, in fact, the prescriptions were for medically unnecessary PCDs issued by the Prescribing Defendants pursuant to predetermined fraudulent protocols and provided to the Defendants pursuant to the Defendants' fraudulent scheme.

### iii.    Powered Pressure-Reducing Air Mattresses

142.    In additional and as part of their fraudulent scheme, the Referring Providers purportedly prescribed, and the Defendants purportedly dispensed and billed for Air Mattresses under HCPCS Code E0277, resulting in charges of $3,961.75 per Insured who purportedly received the device, even though at best, the Defendants dispensed cheap items to the extent any device was dispensed at all.

143.    In legitimate practice, Air Mattresses that conform to HCPCS Code E0277 are mattresses for bed-bound individuals used to prevent and/or heal bed sores, which inflate and deflate to reduce interface pressure by conforming to the body so that pressure is distributed over a large surface. These types of mattresses are reserved for patients with multiple large, truncal Stage III and Stage IV ulcers who have failed to heal with other types of beds.

144.    The contemporaneous medical records do not indicate that the Insureds identified in Exhibits "1" and "2" who received a prescription for Air Mattresses from the Referring Providers were bed-bound, had Stage III or IV ulcers, or even were at high risk of developing an ulcer as they were all ambulatory and not bed-bound.

145.    Virtually all of the charges for Air Mattresses the Defendants submitted were pursuant to preprinted prescription forms prescribing "E0277: Powered Pressure-Reducing Air Mattresses". These prescription forms were distributed to the Referring Providers to sign, and in some cases their signature was then photocopied as part of the Defendants' scheme bill GEICO for medically unnecessary Fraudulent Equipment.

146.    To create the false impression that the Air Mattresses dispensed by the Defendants were medically necessary, the prescriptions issued by the Referring Providers contained the following generic preprinted language on each prescription issued to Insureds:

> Powered Pressure-Reducing Air Mattress reduces pressure on wounds, allowing healing and blood circulation to the affected area.

147.    For these reasons in each of the claims identified in Exhibits "1" through "2" the Defendants falsely represented that Air Mattresses were medically necessary, and were, therefore, eligible to collect No-Fault Benefits, when, in fact, the prescriptions were for medically unnecessary Air Mattresses issued by the Referring Providers pursuant to predetermined fraudulent protocols and provided to the Defendants pursuant to the Defendants' fraudulent scheme.

### 3.    The Predetermined Fraudulent Protocol at the Clinics

148.    Through their collusive arrangements with the John Doe Defendants, the Defendants were able to obtain medically unnecessary and otherwise illegitimate prescriptions for Fraudulent Equipment purportedly issued by a variety of Referring Providers who purported to treat Insureds at the Clinics pursuant to predetermined fraudulent protocols which serves to further illustrate the Defendants' fraudulent scheme.

149.    The Insureds identified in Exhibits "1" and "2" that were prescribed Fraudulent Equipment from the Clinics were typically involved in minor "fender-bender" motor vehicle accidents and then purportedly treated by a variety of healthcare providers at the Clinics.

150.    However, during the course of their treatment at the Clinics, the Insureds were regularly prescribed Fraudulent Equipment that was medically unnecessary, not supported by medical records, and was pursuant to predetermined fraudulent protocols.

151.    The predetermined, fraudulent protocols in relation to the Fraudulent Equipment originating from each and every one of the Clinics identified herein is illustrated by the protocols employed at the Boston Road Clinic.  Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, or whether each patient would actually use the Fraudulent Equipment, the Referring Providers purportedly prescribed, at a minimum, the following Fraudulent Equipment to virtually every Insured

identified in Exhibits "1" and "2": (i) "General Use Cushion (wide)"; (ii) "Lumber [*sic*] Sacral Support"; (iii) "Bed Board"; (vi) "Egg Crate Mattress"; and (v) "Cervical Collar".

152.    Additionally, virtually every Insured who was the driver in the automobile accident also received a prescription for an "Orthopedic Car Seat".

153.    Further, Insureds were also issued separate prescriptions for: (i) "E0747 Osteogenesis Stimulator"; and (ii) "E0277 Powered Pressure-Reducing Air mattress."

154.    To the extent that the Insureds identified in Exhibits "1" and "2" returned to the Boston Road Clinic, they would virtually always be provided with additional prescriptions for additional sets of Fraudulent Equipment purportedly issued by the Referring Providers.

155.    These sets of Fraudulent Equipment would include separate prescriptions for: (i) "E0760 Ultrasound Therapy"; (ii) "E0675 Pneumatic Compression Device"; and/or (iii) "EMS Unit 4 Lead, EMS Belt, Massager, Infrared Heating Lamp, Thermal Moist Heat Pad".

156.    In addition, the Referring Providers would also routinely issue one or more separate additional prescriptions to Insureds for the following Fraudulent Equipment: (i) "LSO w/ APL Control Custom" (ii) "Cervical Traction"; (iii) "Shoulder Orthosis"; and/or (iv) "TLSO."

157.    Further, Insureds were also routinely provided with prescriptions for other types of Fraudulent Equipment that were purportedly provided by other medical supply companies.

158.    Additionally, certain Insureds identified in Exhibits "1" and "2" received multiple separate prescriptions for Fraudulent Equipment on a single date that were purportedly issued by the same Referring Provider.

159.    Multiple separate prescriptions were issued to the Insureds on a single date, and purportedly by the same Referring Provider, as part of the scheme between Defendants and the Clinic Controllers to provide Defendants with the ability to submit separate bills to GEICO for

reimbursement of No-Fault Benefits in a way to lower the amount charged to GEICO on each bill so Defendants could avoid detection of their fraudulent scheme.

160.    The prescriptions purportedly issued by Referring Providers at the Boston Road Clinic (which are representative of all of the Clinics) were not based upon legitimate examinations by the Referring Providers that evaluated each Insured's individual symptom or presentation and determined whether and what type of DME and/or OD to provide.

161.    Rather, these prescriptions were based upon a predetermined fraudulent protocol established by the Clinic Controllers and other John Doe Defendants and were obtained by the Defendants through improper financial arrangements with the Clinic Controllers and other John Doe Defendants.

162.    Furthermore, the initial examination or follow-up examination reports, to the extent that there were contemporaneously dated examination reports, did not accurately identify the Fraudulent Equipment purportedly prescribed to the Insureds. In fact, the reports did not contain sufficient information describing the medical necessity of the prescribed Fraudulent Equipment.

163.    Even more, the follow-up examination reports from the Referring Providers at the Boston Road Clinic failed to include any meaningful information regarding the Insureds' use of the previously prescribed Fraudulent Equipment, to the extent it was even mentioned at all.

164.    Further illustrative of the fact that the Insureds identified in Exhibits "1" and "2" that were treated at the Boston Road Clinic were prescribed Fraudulent Equipment pursuant to predetermined fraudulent protocols in collusion with the John Doe Defendants, Insureds were frequently issued prescriptions for Fraudulent Equipment that were undated.

165.    The predetermined fraudulent protocols related to the prescriptions are demonstrated by the following examples:

(i)     On August 30, 2024, an Insured named KO was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Boston Road Clinic. After an initial examination with Jean-Pierre Barakat, M.D. ("Barakat") on September 11, 2024, Barakat purportedly issued a prescription in the name of KO for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | General Use Cushion (wide)<br>Lumber [*sic*] Sacral Support<br>Bed Board<br>Egg Crate Mattress<br>Cervical Collar<br>Cervical Pillow | **Droz Supply** |

Barakat purportedly issued four separate prescriptions in the name of KO that are undated for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | E0747 Osteogenesis Stimulator | **Droz Supply** |
| 2 | E0277 Powered Pressure-Reducing Air Mattress | **Droz Supply** |
| 3 | LSO w/APL Control Custom | Non-Defendant DME supplier |
| 4 | TLSO | Non-Defendant DME supplier |

On November 20, 2024, after a purported follow-up examination with Barakat, Barakat purportedly issued three separate prescriptions in the name of KO for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | E0760 Ultrasound Therapy | **GB Supply** |
| 2 | E0675 Pneumatic Compression Device | **GB Supply** |
| 3 | EMS Unit Four Lead<br>EMS Belt<br>Personal Massager<br>Infra Red [sic] Lamp<br>Thermal Moist Heat Pad | Non-Defendant DME supplier |

(ii)    On August 30, 2024, an Insured named SS was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Boston Road Clinic. After an initial examination with Barakat on September 11, 2024, Barakat purportedly issued a prescription in the name of SS for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Lumber [*sic*] Sacral Support<br>Bed Board | **Droz Supply** |

| | | |
|---|---|---|
| | Egg Crate Mattress<br>Cervical Collar<br>Cervical Pillow<br>Orthopedic Cart Seat<br>Personal Massager | |

Barakat purportedly issued two separate prescriptions in the name of SS that are undated for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | E0747 Osteogenesis Stimulator | **Droz Supply** |
| 2 | E0277 Powered Pressure-Reducing Air Mattress | **Droz Supply** |

(iii)   On September 19, 2024, an Insured named AL was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Boston Road Clinic. After an initial examination with Barakat on September 25, 2024, Barakat purportedly issued three separate prescriptions in the name of AL for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | General Use Cushion<br>Lumber [*sic*] Sacral Support<br>Bed Board<br>Egg Crate Mattress<br>Cervical Collar<br>Cervical Pillow<br>Orthopedic Cart Seat<br>Whirlpool | **Droz Supply** |
| 2 | E0747 Osteogenesis Stimulator | **Droz Supply** |
| 3 | E0277 Powered Pressure-Reducing Air Mattress | **Droz Supply** |

On October 23, 2024, after a purported follow-up examination with Barakat, Barakat purportedly issued three separate prescriptions in the name of AL for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | E0760 Ultrasound Therapy | **GB Supply** |
| 2 | E0675 Pneumatic Compression Device | **GB Supply** |
| 3 | Thermal Moist Heat Pad<br>EMS Belt<br>EMS Unit 4 Lead<br>Massager<br>Infrared Heating Lamp | Non-Defendant DME supplier |

On November 20, 2024, after a purported follow-up examination with Barakat, Barakat purportedly issued three separate prescriptions in the name of AL for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | LSO W/APL Control Custom | Non-Defendant DME supplier |
| 2 | Cervical Posture Pump Cervical Traction | Non-Defendant DME supplier |
| 3 | Shoulder Orthosis | Non-Defendant DME supplier |

(iv)    On September 29, 2024, an Insured named ZA was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Boston Road Clinic. After an initial examination with Barakat on October 2, 2024, Barakat purportedly issued a prescription in the name of ZA for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | General Use Cushion Lumber [*sic*] Sacral Support Water Circ W/ Pump Bed Board Egg Crate Mattress Cervical Collar Orthopedic Car Seat Cervical Pillow | **Droz Supply** |

Barakat purportedly issued two separate prescriptions in the name of ZA that are undated for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | E0747 Osteogenesis Stimulator | **Droz Supply** |
| 2 | E0277 Powered Pressure-Reducing Air Mattress | **Droz Supply** |

On November 6, 2024, after a purported follow-up examination with Barakat, Barakat purportedly issued eight separate prescriptions in the name of ZA for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | E0760 Ultrasound Therapy | **GB Supply** |
| 2 | E0675 Pneumatic Compression Device | **GB Supply** |
| 3 | LSO W/APL Control Custom | Non-Defendant DME supplier |
| 4 | Cervical Traction | Non-Defendant DME supplier |
| 5 | TLSO | Non-Defendant DME supplier |
| 6 | Shoulder Orthosis - Right | Non-Defendant DME supplier |
| 7 | Shoulder Orthosis – Left | Non-Defendant DME supplier |
| 8 | Thermal Moist Heat Pad | Non-Defendant DME supplier |

| | | |
|---|---|---|
| | EMS Belt<br>EMS Unit 4 Lead<br>Massager<br>Infrared Heating Lamp | |

(v)     On May 31, 2024, an Insured named MC was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Boston Road Clinic. After an initial examination with Barakat on June 5, 2024, Barakat purportedly issued two separate prescriptions in the name of MC for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | General Use Cushion<br>Lumber [*sic*] Sacral Support<br>Bed Board<br>Egg Crate Mattress<br>Cervical Collar<br>Cervical Pillow<br>Water Circ W/ Pump | Non-Defendant DME supplier |
| 2 | Orthopedic Car Seat | Non-Defendant DME supplier |

On July 3, 2024, after a purported follow-up evaluation with Barakat, Barakat purportedly issued three separate prescriptions in the name of MC for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Thermal Moist Heat Pad<br>EMS Belt<br>EMS Unit 4 Lead<br>Massager<br>Infrared Heating Lamp | Non-Defendant DME supplier |
| 2 | LSO W/APL Control Custom | Non-Defendant DME supplier |
| 3 | Pneumatic Compressor<br>Pneumatic Compressor, Segmental, Waist<br>Pneumatic Compressor, Segmental, Arm | Non-Defendant DME supplier |

Barakat also purportedly issued three separate prescriptions in the name of MC that are undated for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | E0277 Powered Pressure-Reducing Air Mattress | **Droz Supply** |
| 2 | E0747 Osteogenesis Stimulator | **Droz Supply** |
| 3 | E0321 Triad 3LT Infrared Heat Pad | **Droz Supply** |

On August 21, 2024, Barakat purportedly issued two separate prescriptions in the name of MC for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | TLSO | **Droz Supply** |
| 2 | Shoulder Orthosis | **Droz Supply** |

(vi)    On May 31, 2024, an Insured named RS was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Boston Road Clinic. After an initial examination with Barakat on June 5, 2024, Barakat purportedly issued two separate prescriptions in the name of RS for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Positioning Cushion<br>Lumber [*sic*] Sacral Support<br>Bed Board<br>Egg Crate Mattress<br>Cervical Collar<br>Cervical Pillow | Non-Defendant DME supplier |
| 2 | Orthopedic Car Seat | Non-Defendant DME supplier |

Barakat also purportedly issued a prescription in the name of RS that is undated for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | E0277 Powered Pressure-Reducing Air Mattress | **Droz Supply** |

On August 21, 2024, after a purported follow-up examination with Barakat, Barakat purportedly issued two separate prescriptions in the name of RS for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Knee Brace | **Droz Supply** |
| 2 | Cervical Traction | **Droz Supply** |

On September 18, 2024, after a purported follow-up examination with Barakat, Barakat purportedly issued a prescription in the name of RS for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Shoulder Orthosis - Right | **Droz Supply** |

(vii)    On July 9, 2024, an Insured named LH was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Boston Road Clinic. After an initial examination with Barakat on August 21, 2024,

Barakat purportedly issued four separate prescriptions in the name of LH for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | General Use Cushion<br>Lumber [*sic*] Sacral Support<br>Bed Board<br>Egg Crate Mattress<br>Cervical Posture Pump<br>Orthopedic Car Seat<br>Cervical Pillow | **Droz Supply** |
| 2 | E0760 Ultrasound Therapy | **Droz Supply** |
| 3 | E0747 Osteogenesis Stimulator | **Droz Supply** |
| 4 | E0277 Powered Pressure-Reducing Air Mattress | **Droz Supply** |

On October 16, 2024, after a purported follow-up evaluation with Barakat, Barakat purportedly issued three separate prescriptions in the name of LH for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | E0675 Pneumatic Compression Device | **GB Supply** |
| 2 | Thermal Moist Heat Pad<br>EMS Belt<br>EMS Unit 4 Lead<br>Massager<br>Infrared Heating Lamp | Non-Defendant DME supplier |
| 3 | Shoulder Orthosis | Non-Defendant DME supplier |

(viii)   On August 21, 2024, an Insured named EL was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Boston Road Clinic on August 28, 2024. Barakat purportedly issued six separate prescriptions in the name of EL that are undated for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | General Use Cushion (wide)<br>Lumber [*sic*] Sacral Support<br>Bed Board<br>Egg Crate Mattress<br>Cervical Collar<br>Orthopedic Car Seat<br>Cervical Pillow | **Droz Supply** |
| 2 | E0747 Osteogenesis Stimulator | **Droz Supply** |
| 3 | E0760 Ultrasound Therapy | **Droz Supply** |
| 4 | E0675 Pneumatic Compression Device | **Droz Supply** |

| 5 | E0277 Powered Pressure-Reducing Air Mattress | **Droz Supply** |
| 6 | Thermal Moist Heat Pad<br>EMS Belt<br>EMS Unit 4 Lead<br>Massager<br>Infrared Heating Lamp | **Droz Supply** |

On October 23, 2024, after a purported follow-up evaluation with Barakat, Barakat purportedly issued four separate prescriptions in the name of EL for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Knee Brace - Right | Non-Defendant DME supplier |
| 2 | Knee Brace – Left | Non-Defendant DME supplier |
| 3 | Shoulder Orthosis - Left | Non-Defendant DME supplier |
| 4 | Shoulder Orthosis - Right | Non-Defendant DME supplier |

On December 4, 2024, after a purported follow-up evaluation with Barakat, Barakat purportedly issued three separate prescriptions in the name of EL for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | LSO W/APL Control Custom | Non-Defendant DME supplier |
| 2 | Cervical Traction | Non-Defendant DME supplier |
| 3 | TLSO | Non-Defendant DME supplier |

(ix)    On August 30, 2024, an Insured named GI was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Boston Road Clinic. After an initial examination with Barakat on September 4, 2024, Barakat purportedly issued five separate prescriptions in the name of GI that are undated for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | General Use Cushion (wide)<br>Lumber [*sic*] Sacral Support<br>Bed Board<br>Egg Crate Mattress<br>Cervical Collar<br>Orthopedic Car Seat<br>Cervical Pillow | **Droz Supply** |
| 2 | E0747 Osteogenesis Stimulator | **Droz Supply** |
| 3 | E0277 Powered Pressure-Reducing Air Mattress | **Droz Supply** |
| 4 | E0760 Ultrasound Therapy | **Droz Supply** |
| 5 | E0675 Pneumatic Compression Device | **Droz Supply** |

On October 2, 2024, after a purported follow-up evaluation with Barakat, Barakat purportedly issued four separate prescriptions in the name of EL for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Knee Brace - Right | **Droz Supply** |
| 2 | LSO W/APL Control Custom | **Droz Supply** |
| 3 | Cervical Traction | **Droz Supply** |
| 4 | Thermal Moist Heat Pad EMS Belt EMS Unit 4 Lead Massager Infrared Heating Lamp | Non-DME Defendant supplier |

On October 30, 2024, after a purported follow-up evaluation with Barakat, Barakat purportedly issued four separate prescriptions in the name of EL for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Knee Brace - Right | Non-DME Defendant supplier |
| 2 | TLSO | Non-DME Defendant supplier |
| 3 | Shoulder Orthosis - Right | Non-DME Defendant supplier |
| 4 | Shoulder Immobilizer | Non-DME Defendant supplier |

(x) On October 16, 2024, an Insured named CB was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Boston Road Clinic. After an initial examination with Barakat on October 16, 2024, Barakat purportedly issued three separate prescriptions in the name of CB for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | General Use Cushion (wide) Lumber [*sic*] Sacral Support Bed Board Egg Crate Mattress Cervical Collar Cervical Pillow | Non-DME Defendant supplier |
| 2 | E0747 Osteogenesis Stimulator | **GB Supply** |
| 3 | E0277 Powered Pressure-Reducing Air Mattress | **GB Supply** |

On November 13, 2024, after a purported follow-up evaluation with Barakat, Barakat purportedly issued three separate prescription in the name of CB for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Thermal Moist Heat Pad | Non-DME Defendant supplier |

|   | EMS Belt<br>EMS Unit 4 Lead<br>Personal Massager<br>Infra Red Lamp |   |
|---|---|---|
| 2 | E0760 Ultrasound Therapy | **GB Supply** |
| 3 | E0675 Pneumatic Compression Device | **GB Supply** |

166. These are only representative examples.

167. Further illustrative of the fact that the prescriptions were pursuant to predetermined fraudulent protocol, many of the prescriptions purportedly issued by Referring Providers at the Boston Road Clinic to the Insureds identified in Exhibits "1" and "2" contained a stamped/photocopied signature.

168. Virtually all the Insureds identified in Exhibits "1" and "2" who were treated at the Clinics were issued prescriptions for Fraudulent Equipment pursuant to predetermined fraudulent protocols, despite only being involved in relatively minor and low-impact motor vehicle accidents.

**E. The Defendants' Manipulation of the Prescriptions Routed to Droz Supply**

169. Once the Defendants obtained the prescriptions issued purportedly issued by the Referring Providers as a result of the Defendants' collusive arrangements with the John Doe Defendants, the Defendants used the prescriptions to bill GEICO via Droz Supply for whatever DME or OD they wanted.

170. In doing so, the Defendants did not bill GEICO for medically necessary DME and OD as determined by a licensed healthcare provider. Instead, the Defendants unlawfully decided what DME and OD to provide Insureds without a proper prescription from a licensed healthcare provider.

171. As part of the Defendants' fraudulent scheme and collusive arrangement with the John Doe Defendants, they utilized the vague and generic prescriptions purportedly issued by the Referring Providers to misrepresent the nature of the items actually prescribed and misrepresent

that the Fraudulent Equipment was for DME/OD that was determined by a licensed healthcare provider to be medically necessary for each Insured.

172.    Upon obtaining the vague and generic prescriptions from Clinic Controllers pursuant to the predetermined protocols and collusive arrangements described above, the Defendants were provided with the opportunity to choose one of several different pieces of Fraudulent Equipment, with varying reimbursement rates in the applicable fee schedule, that relate to the vague and generic terms indicated in the prescriptions.

173.    The ability to choose which specific type of DME and/or OD to provide an individual is specifically reserved for healthcare providers authorized by law to prescribe DME and/or OD.

174.    As an unlicensed healthcare professional, Drozdov was and is not legally authorized to prescribe or direct that an Insured receive any specific type of DME and/or OD. Similarly, Droz Supply is not a licensed professional corporation and does not employ any healthcare professionals who can legally prescribe or direct that an Insured receive any specific type of DME and/or OD.

175.    However, when the Defendants received vague and generic prescriptions for Fraudulent Equipment to purportedly provide Insureds, many of the items in the prescriptions were not specific enough to identify a specific item of DME and/or OD that could be provided to the Insureds.

176.    As a result, whenever the vague and generic prescriptions identified a type of Fraudulent Equipment that had multiple different HCPCS Codes, which are based on the specific and unique features associated with the item, the Defendants chose to bill GEICO using specific

HCPCS Codes thereby asserting that they purportedly provided those unique pieces of Fraudulent Equipment to the Insureds.

177.    In a legitimate setting, upon receiving a vague and generic prescription for a type of DME and/or OD, the provider of DME and/or OD would contact the referring healthcare provider to request clarification on the specific items and features necessary to dispense to each patient.

178.    However, in all of the claims identified in Exhibit "1", whenever there was a vague and generic prescription for a type of DME and/or OD, neither Drozdov nor anyone associated with Droz Supply ever contacted the Referring Provider to request clarification.  Instead, the Defendants made their own determination as to which unique item of Fraudulent Equipment to provide each Insured.

179.    Furthermore, in each and every circumstance where the vague and generic prescriptions allowed the Defendants to choose a unique piece of Fraudulent Equipment, the Defendants billed GEICO for, and thereby chose to purportedly provide the Insured with, the type of Fraudulent Equipment that resulted in one of the higher maximum reimbursable amounts under the applicable fee schedule.

180.    For example, in many of the prescriptions issued to Droz Supply that are part of the claims identified in Exhibit "1", the prescriptions requested that Droz Supply provide such generic items as a "Lumber [*sic*] Sacral Support" without any further specification.

181.    This vague and generic language in the prescriptions from the Referring Providers for lumbar supports directly relates to over 20 different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount, that can be dispensed to Insureds.

182.    As unlicensed healthcare providers, Droz Supply and Drozdov were not legally permitted to determine which of the above-available options were best suited for each Insured that had generic prescriptions for a "Lumber [*sic*] Sacral Support".

183.    Here, Droz Supply and Drozdov never contacted any of the Referring Providers whose names appeared on the vague and generic prescriptions for lumbar sacral related Fraudulent Equipment and instead took it upon themselves to decide which specific type of Fraudulent Equipment they would bill GEICO for, and accordingly purportedly provide the Insureds.

184.    In response to such prescriptions, Droz Supply and Drozdov virtually always submitted a charge of $844.13 under HCPCS Code L0637 pursuant to these generic prescriptions, which has one the highest maximum reimbursable amounts out of the lumbar support items in the Fee Schedule.

185.    Similarly, each and every time that Droz Supply received a prescription from the Referring Providers for a "Cervical Collar", Droz Supply and Drozdov chose to supply and bill GEICO under HCPCS Code L0180 requesting a reimbursement of $233.00, despite the Fee Schedule containing eleven (11) different types of cervical collars.

186.    These are only representative examples.  In virtually all the claims identified in Exhibit "1" that are based upon vague and generic language contained in prescriptions issued by the Referring Providers, Droz Supply and Drozdov decided the unique type of Fraudulent Equipment to purportedly provide Insureds without any legal authority to do so or any clarification from the prescribing healthcare provider.

**F.    The Defendants' Fraudulent Misrepresentations Regarding the DME and OD Purportedly Dispensed**

187.    In addition to obtaining medically unnecessary prescriptions based upon predetermined fraudulent protocols, collusive arrangements with the John Doe Defendants and

dispensing the Fraudulent Equipment without a licensed healthcare provider determining the specific DME/OD was medically necessary, the Defendants submitted bills to GEICO that misrepresented the DME/OD provided to the Insureds – to the extent that any DME/OD actually was provided.

188.    Specifically, the bills submitted to GEICO by the Defendants each misrepresented, to the extent that any Fraudulent Equipment was provided, that the type of Fraudulent Equipment matched the HCPCS Codes identified in the bills to GEICO, when in fact they did not.

### i.    The Defendants Fraudulently Misrepresented the Fee Schedule Items Purportedly Provided

189.    When the Defendants submitted bills to GEICO and other New York automobile insurers, they represented that the Fraudulent Equipment was not only provided to the Insureds, but also that the HCPCS codes used on the bills properly described the type of Fraudulent Equipment that was provided to the Insureds.

190.    As indicated above, the Fee Schedule specifically defines the requirements needed for each HCPCS Code to bill for DME and/or OD.

191.    Additionally, Palmetto provides specific characteristics and requirements that DME and OD must meet in order to qualify for reimbursement under a specific HCPCS Code for both Fee Schedule items and Non-Fee Schedule items.

192.    By submitting bills to GEICO containing specific HCPCS Codes, the Defendants specifically represented that the Fraudulent Equipment they purportedly provided to Insureds appropriately corresponded to the HCPCS Codes contained within each bill.

193.    However, in virtually all of the claims for Fraudulent Equipment identified in Exhibits "1" and "2", when the Defendants submitted bills to GEICO for Fee Schedule items, they fraudulently represented to GEICO that the HCPCS Codes used to bill GEICO were accurate and

appropriate for the Fraudulent Equipment purportedly provided to the Insureds – to the extent that any Fraudulent Equipment was actually provided.

194.    For example, when the Defendants billed GEICO for PCDs under HCPCS Code E0675 seeking $2,826.70, the use of this HCPCS Code severely misrepresented the type of Fraudulent Equipment that was purportedly provided to the Insureds.

195.    Despite billing GEICO – and other New York automobile insurers – using HCPCS Code E0675, the item provided by the Defendants – to the extent the Defendants provided any item to the Insureds – did not comport with the requirements necessary to bill under HCPCS Code E0675 and was instead a cheap, poorly made item not reimbursable at $2,286.70 per unit.

196.    Additionally, when the Defendants billed for Osteo Stim Devices under E0747 and E0760 for either $3,300.00 or $2,700.00, the use of these HCPCS Codes in the bills submitted to GEICO severely misrepresented the type of Fraudulent Equipment that was purportedly provided to the Insureds.

197.    Despite billing GEICO – and other New York automobile insurers – using HCPCS Codes E0747 or E0760, the items provided by the Defendants – to the extent the Defendants provided any items to the Insureds – did not comport with the requirements necessary to bill under HCPCS Codes E0747 or E0760 and were instead cheap, poorly made items not reimbursable at either $3,300.00 or $2,700.00 per unit.

198.    Further, when the Defendants billed for Air Mattresses under E0277 for $3,961.75, the use of this HCPCS Code in the bills submitted to GEICO severely misrepresented the type of Fraudulent Equipment that was purportedly provided to the Insureds.

199.    Despite billing GEICO – and other New York automobile insurers – using HCPCS Code E0277, the items provided by the Defendants – to the extent the Defendants provided any

items to the Insureds – did not comport with the requirements necessary to bill under HCPCS Code E0277 and were instead cheap, poorly made items not reimbursable at $3,961.75 per unit.

200.    In addition to the fraudulent representations made by the Defendants regarding their billing for Osteo Stim Devices under HCPCS Codes E0747 and E0760, PCDs under HCPCS Code E0675, and Air Mattresses under HCPCS Code E0277, Droz Supply also submitted bills to GEICO that fraudulently misrepresented the type of Fraudulent Equipment that they purportedly provided by billing GEICO for "custom fitted" pieces when the Fraudulent Equipment was not customized at all – to the extent that Fraudulent Equipment was actually provided.

201.    As identified in the claims contained within Exhibit "1", Droz Supply often billed GEICO for Fraudulent Equipment that was purportedly customized for each Insured.  Each HCPCS Code, as defined either by the applicable fee schedule or Palmetto, will specify whether the specific item provided to a patient is either "off-the-shelf" or specifically "custom-fabricated" or "custom-fitted" for that individual patient.

202.    In order to help clarify the term "custom-fabricated", Palmetto defined a custom-fabricated orthotic as something that "is individually made for a specific patient. No other patient would be able to use this item. A custom fabricated item is a device which is fabricated based on clinically derived and rectified castings, tracings, measurements, and/or other images (such as x-rays) of the body part. The fabrication may involve using calculations, templates and components. This process requires the use of basic materials including, but not limited to plastic, metal, leather or cloth in the form of uncut or unshaped sheets, bars, or other basic forms and involves substantial work such as vacuum forming, cutting, bending, molding, sewing, drilling and finishing prior to fitting on the patient".  See Palmetto, Correct Coding –3-D Printed Orthotic Devices.

203.    In essence, a custom-fabricated orthotic is created and manufactured from scratch for use by a specific patient.

204.    To help clarify the term "custom-fitted", Palmetto defined a custom-fitted orthotic as something that "requires more than minimal self-adjustment at the time of delivery in order to provide an individualized fit, i.e., the item must be trimmed, bent, molded (with or without heat), or otherwise modified resulting in alterations beyond minimal self-adjustment."  See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

205.    One of the key factors in identifying a "custom-fitted" orthotic is whether the item requires "minimal self-adjustment" or "substantial modification."  Minimum self-adjustment, which for an off-the-shelf orthotic means adjustment that the "beneficiary, caretaker for the beneficiary, or supplier of the device can perform and that does not require the services of a certified orthotist (that is, an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification) or an individual who has specialized training.  For example, adjustment of straps and closures, bending or trimming for final fit or comfort (not all-inclusive) falls into this category."  See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

206.    By contrast, a substantial modification, which is required for a custom-fitted orthotic, is defined as "changes made to achieve an individualized fit of the item that requires the expertise of a certified orthotist or an individual who has equivalent specialized training in the provision of orthotics such as a physician, treating practitioner, an occupational therapist, or physical therapist in compliance with all applicable Federal and State licensure and regulatory

requirements.  A certified orthotist is defined as an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification."  See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

207.    As shown in the claims identified within Exhibit "1", Droz Supply often billed for Fraudulent Equipment that was purportedly "custom-fabricated" or "custom-fitted" for each Insured when – and to the extent that Fraudulent Equipment was actually provided – the items were never custom fabricated or fitted, as that term is defined by Palmetto.

208.    Based upon the prescriptions allegedly issued by the Referring Providers, Droz Supply submitted numerous bills to GEICO for custom fabricated back braces under HCPCS Code L0632 which contained a charge for $1,150.00, custom fabricated shoulder orthoses using HCPCS Code L3674 which contained a charge for $896.92, and customized back braces using HCPCS Code L0637 which contained a charge for $844.13.

209.    The products assigned to HCPCS Codes L0632, L3674, and L0637 are types of orthoses that are customized to fit a particular patient by an individual with expertise, not the prefabricated, off-the-shelf products that could be adjusted by the patients (by simply tightening the straps) and which were dispensed by Droz Supply.

210.    Instead, to the extent that Droz Supply provided any Fraudulent Equipment billed to GEICO as custom-fitted OD, including the charges for L0632, L3674, and L0637, the Fraudulent Equipment was provided without taking any action to custom-fabricate or fit the OD to the Insureds. To the extent that Droz Supply attempted to make any adjustments to the DME received by Insureds identified in Exhibit "1", Droz Supply only provided minimal self-adjustment, as defined by Palmetto, which only supports charges for off-the-shelf items.

211. Further illustrative of the fact that Defendants misrepresented that they custom-fabricated or fit OD purportedly provided to Insureds and billed to GEICO, Drozdov is not a certified orthotist and did not complete sufficient training to become a certified orthotist.

212. The claims identified in Exhibit "1" for HCPCS Code E0272 is another example of how Droz Supply fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

213. Each of the claims identified within Exhibit "1" for HCPCS Code E0272 contained a charge for $155.52 based upon prescriptions for an "Egg Crate Mattress".

214. However, the product represented by HCPCS Code E0272 is defined as a foam rubber mattress, which is an actual full-size mattress, not a mattress topper or pad in the shape of an egg crate.

215. Despite billing GEICO – and other New York automobile insurers – using HCPCS Code E0272, the items provided by Droz Supply – to the extent that Defendants provided the Insureds with any item – were not foam rubber mattresses as required by HCPCS Code E0272.

216. By contrast, to the extent that any items were provided, they were mattress pads or toppers in the shape of egg crates, not an actual mattress. Mattress pads are Fee Schedule items listed under HCPCS Code E0199, which is defined as a "Dry pressure pad for mattress, standard mattress length and width."

217. Unlike the fraudulent charges for $155.52 for each eggcrate mattress billed under HCPCS Code E0272 – and in keeping with the fact that the fraudulent charges were part of the Defendants' scheme to defraud GEICO and other automobile insurers – the Fee Schedule sets a maximum reimbursement rate of $19.48 for each mattress pad/topper billed under HCPCS Code E0199.

218.    In each of the claims identified within Exhibit "1" where Defendants billed for Fraudulent Equipment under HCPCS Code E0272, each of the bills fraudulently misrepresented that Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E0272.

219.    The claims identified in Exhibit "1" for HCPCS Code E2611 is another example of how Droz Supply fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

220.    Each of the claims identified within Exhibit "1" for HCPCS Code E2611 contained a charge for $282.40 based upon prescriptions for a "General Use Cushion".

221.    However, the product represented by HCPCS Code E2611 is defined as a general use wheelchair cushion with a width of less than 22 inches.

222.    Despite billing GEICO – and other New York automobile insurers – using HCPCS Code E2611, the items provided by Droz Supply – to the extent that Defendants provided the Insureds with any item in response to the prescriptions for cushions – were not cushions for use with a wheelchair.

223.    In keeping with the fact that the cushions provided to the Insureds were not for a wheelchair, virtually none of the Insureds identified in Exhibit "1" who were provided with a cushion by Droz Supply that was billed to GEICO under HCPCS Code E2611, were in a wheelchair.

224.    By contrast, to the extent that any items were provided, the items were positioning cushions, which are Fee Schedule items listed under HCPCS Code E0190. HCPCS Code E0190 is defined as a "Positioning cushion/pillow/wedge, any shape or size, includes all components and accessories."

225.     Unlike the fraudulent charges for $282.40 for each "General Use Cushion" billed under HCPCS Code E2611 – and in keeping with the fact that the fraudulent charges were part of Defendants' scheme to defraud GEICO and other automobile insurers – the Fee Schedule sets a maximum reimbursement rate of $22.04 for each positioning cushion billed under HCPCS Code E0190.

226.     In each of the claims identified within Exhibit "1" where Droz Supply billed for Fraudulent Equipment under HCPCS Code E2611, each of the bills fraudulently misrepresented that Droz Supply provided the Insureds with equipment that satisfies the requirements of HCPCS Code E2611.

227.     The claims identified in Exhibit "1" for HCPCS Code T5001 are another example of how Droz Supply fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

228.     Each of the claims identified within Exhibit "1" for HCPCS Code T5001 contained a charge of $756.03 based upon prescriptions for an "Orthopedic Car Seat".

229.     However, the product represented by HCPCS Code T5001 is defined as a positioning seat for persons (primarily children) with special orthopedic needs such as cerebral palsy, whose postural needs cannot be safely met by less costly alternatives such as the vehicle's restraint system or other restraint systems, and the person cannot use a standard/commercially available car seat.

230.     However, the orthopedic car seats purportedly provided by Droz Supply – to the extent that any items were provided – qualified as positioning cushions, which are Fee Schedule items listed under HCPCS Code E0190, defined as a "positioning cushion/pillow/wedge, any

shape or size, includes all components and accessories", and having a maximum reimbursement rate of $22.04 per unit.

231.    These are only representative examples. In the bills submitted to GEICO, and as shown in the charges identified in Exhibits "1" and "2", the Defendants regularly misrepresented the Fraudulent Equipment provided to the Insureds, to the extent that any Fraudulent Equipment was provided, in order to maximize the amount of No-Fault Benefits that they could obtain from GEICO.

## III.    The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO

232.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted hundreds of NF-3 forms, and/or treatment reports to GEICO through and in the names of Droz Supply and GB Supply, seeking payment for the Fraudulent Equipment.

233.    The NF-3 forms, and treatment reports that the DME Providers submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

(i)    The NF-3 forms, HCFA-1500 forms, treatment reports, prescriptions, and delivery receipts uniformly misrepresented to GEICO that Defendants provided Fraudulent Equipment pursuant to prescriptions by licensed healthcare providers for reasonable and medically necessary DME and therefore were eligible to receive No-Fault Benefits. In fact, Defendants were not entitled to receive No-Fault Benefits because, to the extent that the DME Providers provided any of Fraudulent Equipment, they were not never properly licensed by the DCWP as they did not obtain Dealer for Products Licenses.

(ii)    The NF-3 forms, HCFA-1500 forms, treatment reports, prescriptions, and delivery receipts uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment pursuant to legitimate prescriptions from licensed healthcare providers for reasonable and medically necessary DME and/or OD and therefore were entitled to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any Fraudulent Equipment, it was pursuant to a fraudulent scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and

included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols.

(iii)    The NF-3 forms, HCFA-1500 forms, and the prescriptions uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment pursuant to legitimate prescriptions from licensed healthcare providers for reasonable and medically necessary DME and/or OD and therefore were entitled to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any Fraudulent Equipment, it was pursuant to a fraudulent scheme that included dispensing Fraudulent Equipment (a) based on prescriptions secured through collusive arrangements with the John Doe Defendants, and (b) based on prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; and

(iv)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly represented to GEICO that Defendants provided Fraudulent Equipment that directly corresponded to the HCPCS Codes contained within each form and therefore were entitled to receive No-Fault Benefits. In fact, Defendants were not entitled to receive No-Fault Benefits because – to the extent that Defendants provided any Fraudulent Equipment to the Insureds – the Fraudulent Equipment often did not meet the specific requirements for the HCPCS Codes identified in the NF-3 forms and HCFA-1500 forms.

## IV.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

234.    The Defendants legally and ethically are obligated to act honestly and with integrity in connection with the provision of DME and OD to Insureds, and their actual submission of charges to GEICO.

235.    To induce GEICO to promptly pay the fraudulent charges for Fraudulent Equipment, Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

236.    Specifically, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the provision of the Fraudulent Equipment was pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known (i.e. the John Doe Defendants), without regard for genuine patient care.

237.    Additionally, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the provision of the Fraudulent Equipment was pursuant to an insurance fraud scheme, which included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, including prescriptions secured through collusive arrangements, and were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures.

238.    Furthermore, the Defendants knowingly misrepresented and concealed facts to prevent GEICO from discovering that the provision of the Fraudulent Equipment dispensed was pursuant to an insurance fraud scheme in which decisions were made by laypersons, without legal authority to issue a prescription, and not by an actual healthcare provider.

239.    In addition, the Defendants knowingly misrepresented and concealed facts to prevent GEICO from discovering that the HCPCS Codes for Fraudulent Equipment contained in the bills submitted by the Defendants to GEICO did not accurately reflect the type of Fraudulent Equipment purportedly provided to the insureds

240.    The Defendants also regularly submitted multiple bills to GEICO for Fraudulent Equipment purportedly provided to an Insured on a single date in an attempt to conceal their scheme to fraudulently bill GEICO for Fraudulent Equipment purportedly provided to GEICO's Insureds by artificially lowering the amount of any one bill submitted to GEICO.

241.    Finally, the Defendants knowingly misrepresented that they were lawfully licensed by the City of New York as they never complied with regulations requiring the DME Providers to obtain a Dealer in Products License from the DCWP.

242.    The billing and supporting documentation submitted by the DME Providers, when viewed in isolation, did not reveal its fraudulent nature.

243.    The Defendants hired law firms to pursue collection of the charges associated with the Fraudulent Equipment from GEICO and other insurers.  These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

244.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within thirty (30) days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $835,000.00 based upon the fraudulent charges representing payments voluntarily made by GEICO to Defendants.

245.    Based upon Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against Droz Supply and GB Supply
### (Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)

246.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

247.    There is an actual case in controversy between GEICO and each of the DME Providers regarding more than $1.2 million in fraudulent billing that has been submitted to GEICO in the names of DME Providers and still remains pending.

248.    The DME Providers have no right to receive payment for any pending bills submitted to GEICO because the bills for Fraudulent Equipment were not based upon medical

necessity but were instead submitted as part of an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known (i.e. the John Doe Defendants), without regard for genuine patient care.

249.    The DME Providers have no right to receive payment for any pending bills submitted to GEICO because the bills for Fraudulent Equipment were pursuant to an insurance fraud scheme, which included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, including prescriptions secured through collusive arrangements, and were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures.

250.    The DME Providers have no right to receive payment for any pending bills submitted to GEICO because the DME Providers purportedly provided Fraudulent Equipment as a result of decisions made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions.

251.    The DME Providers have no right to receive payment for any pending bills submitted to GEICO because – to the DME Providers actually provided any Fraudulent Equipment – they fraudulently misrepresented the type of Fraudulent Equipment purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fraudulent Equipment provided to the Insureds

252.    The DME Providers have no right to receive payment for any pending bills submitted to GEICO because Defendants did not comply with all local licensing laws as the DME Providers never obtained Dealer in Products licenses.

253.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Defendants have no right to receive payment for

any pending bills submitted to GEICO under the names of Droz Supply and GB Supply.

## SECOND CAUSE OF ACTION
### Against the Paper Owner Defendants and John Doe Defendant "1"
### (Violation of RICO, 18 U.S.C. § 1962(c))

254.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

255.    Droz Supply and GB Supply together constitute an association-in-fact "enterprise" (the "DME Provider Enterprise"), as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

256.    The members of the DME Provider Enterprise are and have been associated through time, joined in purpose, and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Droz Supply and GB Supply are ostensibly independent businesses – with different names and tax identification numbers – that were used as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO and other New York automobile insurers.

257.    The DME Provider Enterprise operated under separate names and tax identification numbers in order to limit the time period and volume of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one business. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the DME Provider Enterprise acting singly or without the aid of each other.

258.    The DME Provider Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing, overseeing and

coordinating many individuals who have been responsible for facilitating and performing a wide variety of administrative and ostensibly professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts and/or illegal verbal agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

259.   The Paper Owner Defendants and John Doe Defendant "1" have each been employed by and/or associated with the DME Provider Enterprise.

260.   Paper Owner Defendants and John Doe Defendant "1" knowingly have conducted and/or participated, directly or indirectly, in the conduct of the DME Provider Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that the DME Provider Enterprise was not eligible to receive under the No-Fault Laws, because: (i) the DME Providers misrepresented that they had lawful Dealer in Products Licenses and were entitled to No-Fault Benefits when in fact none of the DME Providers were lawfully licensed to dispense DME to Insureds located within the City of New York as they never obtained Dealer in Products Licenses; (ii) the bills submitted to GEICO for the provision Fraudulent Equipment were not based upon medical necessity but were instead submitted pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not

medically necessary and prescribed pursuant to predetermined fraudulent protocols; (iii) the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants, and based on prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iv) the Fraudulent Equipment was dispensed pursuant to decisions by laypersons who are not legally authorized to prescribe DME; and (v) to the extent the DME Providers actually provided any Fraudulent Equipment, the DME Providers fraudulently misrepresented the type of Fraudulent Equipment purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fraudulent Equipment provided to the Insureds. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the charts annexed hereto as Exhibits "1" and "2".

261.    The DME Provider Enterprise's business is racketeering activity, since the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which the Paper Owner Defendants and John Doe Defendant "1" operated the DME Providers, since the DME Providers never operated as a legitimate DME provider, never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for the DME Providers to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through the DME Providers to the present day.

262.    The DME Provider Enterprise is engaged in inherently unlawful acts since it continues to both submit fraudulent billing to GEICO and to attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are

taken by the DME Provider Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-fault billing.

263.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $835,000.00 pursuant to the fraudulent bills submitted by Defendants through the DME Provider Enterprise.

264.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against the Paper Owner Defendants and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

265.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

266.    The DME Provider Enterprise is an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

267.    The Paper Owner Defendants and the John Doe Defendants are employed by and/or associated with the DME Provider Enterprise.

268.    The Paper Owner Defendants and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the DME Provider Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that the DME Providers were not eligible to receive under the No-Fault Laws because: (i) the DME Providers misrepresented that they had lawful Dealer in Products Licenses and were entitled to No-Fault Benefits when in fact none of the DME Providers were lawfully licensed to dispense DME to

Insureds located within the City of New York as they never obtained Dealer in Products Licenses; (ii) the bills submitted to GEICO for the provision Fraudulent Equipment were not based upon medical necessity but were instead submitted pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols; (iii) the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants, and based on prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iv) the Fraudulent Equipment was dispensed pursuant to decisions by laypersons who are not legally authorized to prescribe DME; and (v) to the extent the DME Providers actually provided any Fraudulent Equipment, the DME Providers fraudulently misrepresented the type of Fraudulent Equipment purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fraudulent Equipment provided to the Insureds.  The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the charts annexed hereto as Exhibits "1" and "2".

269.    The Paper Owner Defendants and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

270.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $835,000.00 pursuant to the fraudulent bills submitted by Defendants through the DME Provider Enterprise.

271.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

<u>**FOURTH CAUSE OF ACTION**</u>
**Against Droz Supply, Drozdov, and John Doe Defendant "1"**
**(Common Law Fraud)**

272.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

273.    Droz Supply, Drozdov, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

274.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Droz Supply was in compliance with all local licensing requirements to dispense DME to Insureds located within the City of New York when in fact Droz Supply was not lawfully licensed as it never obtained a Dealer in Products License; (ii) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME and/or OD when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, (iii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants, and based on prescriptions that were otherwise

illegitimate because they contained photocopied or otherwise duplicated signatures; (iv) in many claims, that Fraudulent Equipment was issued based upon legitimate prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; and (iv) in many claims, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when the Fraudulent Equipment provided, to the extent that any Fraudulent Equipment actually was provided, did not meet the requirements for the specific HCPCS Codes billed to GEICO.  A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

275.    Droz Supply, Drozdov and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Droz Supply that were not compensable under New York No-Fault insurance laws.

276.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $530,000.00 to the fraudulent bills submitted by Droz Supply, Drozdov, and John Doe Defendant "1".

277.    The extensive fraudulent conduct of Droz Supply, Drozdov, and John Doe Defendant "1" demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

278.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and

punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against Droz Supply, Drozdov, and John Doe Defendant "1"**
**(Unjust Enrichment)**

279.    GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

280.    As set forth above, Droz Supply, Drozdov, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

281.    When GEICO paid the bills and charges submitted by or on behalf of Droz Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

282.    Droz Supply, Drozdov, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Droz Supply, Drozdov, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

283.    Droz Supply, Drozdov, and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

284.    By reason of the above, Droz Supply, Drozdov, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $530,000.00

**SIXTH CAUSE OF ACTION**
**Against GB Supply, Borntikov, and John Doe Defendant "1"**
**(Common Law Fraud)**

285.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

286.    GB Supply, Bornitkov, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

287.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that GB Supply was in compliance with all local licensing requirements to dispense DME to Insureds located within the City of New York when in fact GB Supply was not lawfully licensed as it never obtained a Dealer in Products License; (ii) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME and/or OD when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, (iii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants, and based on prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iv) in many claims, that Fraudulent Equipment was issued based upon legitimate prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; and (iv) in many claims, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when

the Fraudulent Equipment provided, to the extent that any Fraudulent Equipment actually was provided, did not meet the requirements for the specific HCPCS Codes billed to GEICO. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

288.    GB Supply, Bortnikov, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through GB Supply that were not compensable under New York No-Fault insurance laws.

289.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $300,000.00 pursuant to the fraudulent bills submitted by GB Supply, Bortnikov, and John Doe Defendant "1".

290.    The extensive fraudulent conduct of GB Supply, Bortnikov, and John Doe Defendant "1" demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

291.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## **SEVENTH CAUSE OF ACTION**
### **Against GB Supply, Bornitkov, and John Doe Defendant "1"**
### **(Unjust Enrichment)**

292.    GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

293.    As set forth above, GB Supply, Bornitkov, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

294.    When GEICO paid the bills and charges submitted by or on behalf of GB Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

295.    GB Supply, Bornitkov, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that GB Supply, Bornitkov, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

296.    GB Supply, Bornitkov, and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

297.    By reason of the above, GB Supply, Bornitkov, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less $300,000.00.

**EIGHTH CAUSE OF ACTION**
**Against the John Doe Defendants**
**(Aiding and Abetting Fraud)**

298.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

299.    The John Doe Defendants knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Drozdov, Bornitkov, Droz Supply, and GB Supply.

300.    The acts of the John Doe Defendants in furtherance of the fraudulent scheme included, among other things, knowingly engaging in collusive arrangements with the Defendants for the procurement of medically unnecessary prescriptions for Fraudulent Equipment issued

pursuant to a pre-determined protocol to maximize profits without regard to patient care and routing those prescriptions directly to the Defendants and bypassing the Insureds.

301.    The conduct of the John Doe Defendants in furtherance of the fraudulent scheme was significant and material.  The conduct of the John Doe Defendants was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for the Defendants to bill for Fraudulent Equipment and obtain payment from GEICO and other insurers.

302.    The John Doe Defendants aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Drozdov, Bornitkov, Droz Supply, and GB Supply for medically unnecessary Fraudulent Equipment because they sought to continue profiting through the fraudulent scheme.

303.    The conduct of the John Doe Defendants caused GEICO to pay more than $835,000.00 pursuant to the fraudulent bills submitted through Droz Supply and GB Supply.

304.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

305.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief that the Court deems just and proper.

## JURY DEMAND

306.    Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against Droz Supply and GB Supply for a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Droz Supply and GB Supply have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of action against the Paper Owner Defendants and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $835,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against the Paper Owner Defendants and the John Doe Defendants for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $835,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.    On the Fourth Cause of Action against Droz Supply, Drozdov, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $521,000.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

F.    On the Fifth Cause of Action against Droz Supply, Drozdov, and John Doe Defendant "1" for more than $521,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

H.    On the Sixth Cause of Action against GB Supply, Bornitkov, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $300,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

I.    On the Seventh Cause of Action against GB Supply, Bornitkov, and John Doe

Defendant "1" for more than $300,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

J.      On the Eighth Cause of Action against John Doe Defendants "1" – "10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $835,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper.

Dated:  October 3, 2025
            Uniondale, New York

                                        RIVKIN RADLER LLP


                                        By:  _/s/ Barry I. Levy_
                                                Barry I. Levy
                                                Michael A. Sirignano
                                                Michael Vanunu
                                                Jaana Singh
                                        926 RXR Plaza
                                        Uniondale, New York 11556
                                        (516) 357-3000

                                        *Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*

4914-2631-7900, v. 10